nUNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| Tahisha Williams-Brewer on her own behalf and on behalf of her minor son, K.W., | Court File 09-cv-03524 JRT/JJG |
| Plaintiffs, | **DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| v. | |
| Minneapolis Park and Recreation Board of the City of Minneapolis, Minneapolis Park Police Officer Keith Rowland (in his individual and official capacity), and Minneapolis Park Police Officer James Cannon (in his individual and official capacity), | |
| Defendants. | |

---

## I. INTRODUCTION

Plaintiff Tahisha Williams-Brewer, on her own behalf and on behalf of her minor son K.W., brought suit against Defendants Minneapolis Park and Recreation Board (Park Board) and Park Board Police Officers Keith Rowland (Rowland) and James Cannon (Cannon) in their individual and official capacities alleging: 1) a Section 1983 claim for excessive force and unreasonable seizure (Count I); 2) a common law battery claim (Count II); 3) race discrimination in violation of the Minnesota Human Rights Act (MHRA), Minn. Stat. ch. 363A (Count III); 4) negligence (Count IV); 5) medical expenses and loss of services (Count V); and 6) vicarious liability against the Park Board (Count VI). Defendants Park Board and Officers Rowland and Cannon now move for partial summary judgment on the following

claims: race discrimination (Count III); negligence (Count IV); and medical expenses and loss of services (Count V). It is Defendants' position that there are no material facts in dispute with regard to any of these claims and that they are therefore entitled to judgment as a matter of law.

## II. STATEMENT OF UNDISPUTED FACTS[1]

Plaintiff's minor son K.W.[2] (hereinafter K.W.) is an African-American. On May 20, 2009, K.W. went to Creekview Park which is owned by Defendant Park Board. *Affidavit of Ann Walther (hereinafter "Walther Aff."),* Exhibit 1 at 16.[3] K.W. was in the habit of going there after school to hang out with his friends and use the computers and other facilities at the park. *Id.* Prior to May 20, 2009, K.W. had never had any issues with any of the staff at the park or any interaction with any Park Board police officers. *Id.* at 14-15.

According to K.W., on that day, Dylin Johnson (Johnson), an employee of the Park Board tried to interject himself into a conversation that K.W. was having with some of his friends[4] inside the center building at Creekview Park. *Id.* at 18. Soon thereafter, Johnson told K.W. that he, and only he, would have to leave the park or that Johnson would call the Park Police to have K.W. removed. *Id.* at 19. K.W. protested stating: "It's not your park. You

---

[1] The court should note that most of the "facts" are the Plaintiff's son's version of them. The Park Board and Officers Rowland and Cannon do not agree with Plaintiff's son's version of the facts. Nonetheless, they are viewing the facts in the light most favorable to the Plaintiff for the purpose of their motion for partial summary judgment and only for this motion. The court should also note that Plaintiff was not at the park on May 20, 2009.
[2] In May 2009, K.W. was twelve (12) years old. Walther Aff., Exhibit 1 at 6.
[3] The page numbers cited to in this Memorandum refer to the pages in the corresponding transcript.
[4] K.W. was with four of his friends all of whom were either African American or Asian. *Walther Aff.*, Exhibit 1 at 25.

2

don't own the park. I can be here." *Id.* Nonetheless, K.W. walked out of the center building into the skate park. *Id.* at 21. K.W. was out in the skate park for about 10 minutes and then went back into the center building. *Id.* at 22.

As he approached the front desk of the building, Johnson stopped him and told K.W. again that he would have to leave. *Id.* at 23, 28. Then, according to K.W.,[5] Johnson got on the telephone and apparently called the Park Police. *Id.* at 24, 26. K.W., however, still didn't think he had to leave the building. *Id.* at 25. So, he tried going into the gym. *Id.* at 29-30, 32. Johnson then grabbed K.W. and pushed him out of the gym. *Id.* at 34. At that point, K.W. ran out of the side door by the gym and left "out that way." *Id.* Shortly thereafter, K.W. walked back into building through its main entrance to buy a sucker from someone that was selling candy near the front desk. *Id.* at 34-36.

On May 20, 2009, Park Police Officers Rowland and Cannon were on patrol in the Fourth Precinct when they received a call from dispatch stating that there was an "unwant"[6] at Creekview Park. Walther Aff., Exhibit 2 at 15, 20; Walther Aff., Exhibit 3 at 12. The call indicated that the "unwant" was a Black male named K[7] who was 14 years old, wearing a brown shirt with jean shorts, carrying a back pack and a skate board. Walther Aff., Exhibit 4. Rowland and Cannon responded to the call and went to the park. Walther Aff., Exhibit 2 at 12-17; Walther Aff., Exhibit 3 at 12.

---

[5] The record from dispatch for the Park Police indicates that another Park Board employee had actually called the police. Walther Aff., Exhibit 4. This, however, is not a material fact in dispute.
[6] An "unwant" is essentially a trespass. Walther Aff., Exhibit 3 at 12; Walther Aff., Exhibit 2 at 17.
[7] The first name of the "unwant" was given to the police. For purposes of this summary judgment motion the initial "K" will be used instead of the minor's full name.

When the officers arrived at the park, K.W. was standing at the front desk of the center building eating his sucker. Walther Aff., Exhibit 1 at 39. Officer Rowland[8] asked K.W. if his name was K. *Id.* at 38. K.W. responded "yeah." *Id.* The officers then asked K.W. to leave the park. Walther Aff., Exhibit 3 at 14; Walther Aff., Exhibit 2 at 18. K.W. responded that the officers couldn't make him leave. *Id.* Cannon grabbed the sucker out of K.W.'s mouth and threw it on the floor. Walther Aff., Exhibit 1 at 39; Walther Aff., Exhibit 2 at 22.[9] Rowland then grabbed K.W.'s left arm by placing one hand on K.W.'s upper forearm while Cannon grabbed K.W.'s right arm in the same manner and started to escort K.W. out of the center building. Walther Aff., Exhibit 1 at 41-42. The officers described this as an "escort" hold. Walther Aff., Exhibit 2 at 8-10; Walther Aff., Exhibit 3 at 8-9, 18.

K.W. claims that the officers never said anything to him. Walther Aff., Exhibit 1 at 43. The officers, however, claim that they told K.W. repeatedly that he had to leave the building and tried to calm him down. Walther Aff., Exhibit 2 at 18; Walther Aff., Exhibit 3 at 14-17. K.W. resisted. Walther Aff., Exhibit 1 at 47. According to K.W., at this point Rowland had one hand on K.W.'s upper left arm and one hand on K.W.'s left forearm and was pushing the arm up in an attempt to get the arm behind K.W.'s back. *Id.* K.W. kept pushing his arm down. *Id*. At some point, the officers heard a "snap" or a "pop." Walther Aff., Exhibit 2 at 26-27; Walther Aff., Exhibit 3 at 25. K.W. also heard a snap. Walther

---

[8] K.W. did not know the name of the officers and identified them according to their height, e.g. "the short one." Walther Aff., Exhibit 1 at 39. The deposition testimony of the officers reveals that Rowland (5' 7") is shorter than Cannon (6'3"). Walther Aff., Exhibit 2 at 21; Walther Aff., Exhibit 3 at 15.

[9] Cannon testified that as he was escorting K.W. out of the building, he realized that K.W. had a candy sucker in his mouth and removed it so that K.W. wouldn't choke. Walther Aff., Exhibit 2 at 22. He also testified that he either put it or threw it on the ground. *Id.*

Aff., Exhibit 1 at 47. Rowland and Cannon immediately released their hold on K.W. *Id.* at 49. They told K.W. again to calm down and told him that they thought his arm was broken. Walther Aff., Exhibit 2 at 26-28; Walther Aff., Exhibit 3 at 23-26. Cannon helped K.W. to get down on the ground. Walther Aff., Exhibit 2 at 35.

The officers then called for an ambulance. *Id*. at 31, 37. By the time the ambulance arrived, K.W.'s stepfather had come to the park. Walther Aff., Exhibit 1 at 54; Walther Aff., Exhibit 3 at 31. The officers explained what had happened to K.W.'s stepfather and informed him that K.W. would be taken to North Memorial Hospital. Walther Aff., Exhibit 2 at 40. At the hospital, the officers learned that K.W.'s left arm was broken. Walther Aff., Exhibit 2 at 48-49; Walther Aff., Exhibit 3 at 40. After learning the extent of K.W.'s injuries, the officers cleared the scene. Walther Aff., Exhibit 2 at 49; Walther Aff., Exhibit 3 at 40. K.W. was subsequently charged with trespass and obstruction. Walther Aff., Exhibit 2 at 50. The officers do not know, however, what happened to the charge. *Id*. at 51.

### III. STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, presents no genuine issue of material fact. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 246 (1986). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-248 (emphasis omitted). And, the party opposing summary judgment may not rest upon the allegations set forth in its pleadings

but must produce significant probative evidence demonstrating a genuine issue for trial. *See Anderson*, 477 U.S. at 248-249; *see also Hartnagel v. Norman*, 953 F.2d 394, 395-96 (8th Cir. 1992). If the opposing party fails to carry that burden, or fails to establish an essential element of its case on which that party will bear the burden at trial, summary judgment should be granted. *See Celotex*, 477 U.S. at 322.

## IV.  ARGUMENT

### A.  Plaintiff Cannot Establish a Claim for Race Discrimination under the MHRA (Count III).

Plaintiff claims that Rowland and Cannon violated Minn. Stat. §363A.12 by discriminating against her son in the area of public services on the basis of his race. Plaintiff's claim is without merit.

The MHRA protects individuals against discrimination "in access to, admission to, full utilization of or benefit from any public service because of race." *Id.* To establish a prima facie case of discrimination under this statute, a claimant must introduce evidence showing that 1) he/she is a member of a protected class; 2) he/she was subjected to adverse and unreasonable treatment; and 3) the treatment was caused by a discriminatory consideration of race. *City of Minneapolis v. Richardson*, 239 N.W.2d 197, 201-02 (Minn. 1976). The third element of a prima facie case may be established either by direct or indirect evidence. *Id.* at 202. Direct evidence consists of obvious, objective statements of a discriminatory motive resulting in the adverse action. *Id.* Indirect evidence requires proof that the claimant was treated differently with respect to public services than others

similarly situated except for race, or that the treatment of the claimant was so different from what would be expected that discrimination is the probable explanation. *Id.*

To determine whether the MHRA has been violated, courts look to the totality of the circumstances surrounding the alleged discriminatory conduct. *See, e.g. State by Beaulieu v. City of Mounds View*, 518 N.W.2d 567, 572 (Minn. 1994). Ultimately, the court must decide whether Defendants' actions were "so at variance with what would reasonably be anticipated, absent racial discrimination, that racial discrimination is the probable explanation." *Id.*

In this case, the totality of the circumstances does not support any inference of racial discrimination. Here, Rowland and Cannon responded to a dispatch call that there was an "unwant" at Creekview Park. Walther Aff., Exhibit 2 at 16; Walther Aff., Exhibit 3 at 12. The officers went to the park in order to remove K.W. from the park. There is no evidence that the officers made any discriminatory comments, used racial epithets or acted maliciously in so doing. The only thing that the Plaintiff might point to in this case is her claim that the officers used excessive force in removing her son from the park. The use of excessive force will not, however, support her claim for discrimination. *Hixon v. City of Golden Valley*, 2007 WL 1655831 (D. Minn. June 7, 2007).[10]

In *Hixon,* the Court agreed with defendants' argument that the totality of the circumstances in that case did not support any inference of public service discrimination. *Id.* The Court wrote:

---

[10] A copy of this case is provided to the court attached to the Transmittal Affidavit of Ann Walther as Exhibit 6

7

> The best that Hixon can point to in support of his claim is that the quantum of force used by the officers in effecting his arrest was excessive. In the Court's view, this fact, standing alone, simply cannot mean that the officers' actions were undertaken on account of Hixon's race. Indeed, were that the case, any use of excessive force would amount to a *per se* violation of the MHRA. Moreover, unlike in *Richardson*,[11] Hixon has presented no evidence that Defendants used racial epithets or other racially derogatory remarks.
>
> Simply put, no reasonable jury could conclude that there exists any nexus between Hixon's race and the officers' conduct in this case.

*Id.*

Likewise in this case, the best that Plaintiff can point to in support of her discrimination claim is the quantum of force used by the officers. This is insufficient to establish any nexus between K.W.'s race and the officers' conduct in this case. *See id.; see also Hawks v. J.P. Morgan Chase Bank*, 591 F.3d 1045, 1049 (8th Cir. 2010)(granting motion to dismiss employment discrimination claim where plaintiff merely alleged in a conclusory fashion that he was treated differently from other employees and that he was subjected to hostility, humiliation and criticism, but he failed to adequately connect this conduct to his gender). Her claim under the MHRA therefore fails as a matter of law.

**B.    Officers Rowland and Cannon Are Entitled to Official Immunity on Plaintiff's Negligence Claim (Count IV).**

Plaintiff claims that Rowland and Cannon "seized K.W. in a manner that was negligent, careless, reckless and illegal." Therefore, Plaintiff claims she is entitled to relief for the officers' alleged negligence.

---

[11] In *Richardson*, an unjustified arrest coupled with a racial epithet was sufficient to establish treatment so at variance with what was reasonably expected that discriminatory bias was the only probable explanation. *Richardson*, 239 N.W.2d at 202.

To establish a negligence claim under Minnesota law, a party must prove (1) duty; (2) breach; (3) causation; and (4) damages. *Woehrle v. City of Mankato*, 647 N.W.2d 549, 551 (Minn. App. 2002). Plaintiff cannot establish that the officers owed any duty to K.W.; she therefore cannot establish prima facie case of negligence under Minnesota law. But even if she could, Officers Rowland and Cannon are entitled to official immunity on Plaintiff's negligence claim.

Minnesota's official immunity doctrine provides "a public official charged by law with duties which call for the exercise of judgment or discretion is not personally liable to an individual for damages unless he is guilty of a willful or malicious wrong." *Elwood v. Rice County*, 423 N.W.2d 671, 677 (Minn. 1988). Official immunity "protects public officials from the fear of personal liability that might deter independent action and impair the effective performance of their duties." *Id.* at 678. "Official immunity involves the kind of discretion which is exercised on an operational rather than a policy making level, and it requires something more than the performance of 'ministerial' duties." *Pletan v. Gaines,* 494 N.W.2d 38, 40 (Minn. 1992).

Ministerial duties are duties that are "absolute, certain, or imperative." *Watson by Hanson v. Metro. Transit Comm'n*, 553 N.W.2d 406, 414 (Minn. 1996); *see also Kari v. City of Maplewood,* 582 N.W.2d 921, 923 (Minn. 1998) (holding a ministerial act involves merely the execution of a specific, absolute duty). In contrast, a discretionary act is one for which an official must exercise "judgment or discretion." *Elwood,* 423 N.W.2d at 677. A police officer who performs his or her duty to prevent crime and

enforce the law is not generally acting in a ministerial capacity, but is usually exercising discretion. *Elwood*, 423 N.W.2d at 678.

The determination of whether official immunity is available in a given context requires a two step inquiry: 1) were the alleged acts discretionary or ministerial; and 2) were the alleged acts malicious or willful and therefore stripped of the immunity's protection. *Davis v. Hennepin County*, 559 N.W.2d 117, 122 (Minn. App. 1997), *review denied* (Minn. May 20, 1997). Whether official immunity applies is a question of law. *Kari*, 582 N.W.2d at 923.

1. **<u>Rowland's and Cannon's acts were discretionary</u>.**

Rowland and Cannon arrived at Creekview Park on May 20, 2009 in response to the park's request to remove an "unwant" from the park. The manner in which they removed this "unwant' from the park involved their professional judgment in carrying out their duties as police officers. It was a discretionary act. *See Huttner v. State*, 637 N.W.2d 278, 284 (Minn. App. 2001) (holding "a discretionary act involves individual professional judgment, reflecting the professional goals and factors of a situation.") Thus, this is a situation that falls within the scope of actions protected by official immunity. *See Dokman v. County of Hennepin*, 637 N.W.2d 286, 296 (Minn. App. 2001), *review denied* (Minn. Feb. 28, 2002) (finding discretionary act even though the sheriff's department had specific procedures for dealing with suicide threats); *State by Beaulieu v. City of Mounds View*, 518 N.W.2d 567, 569-70 (Minn. 1994) ("recogniz[ing] that generally the duties of police officers call for the exercise of significant judgment and discretion"); *Gleason v. Metro. Council Transit Operations*, 582 N.W.2d 216, 220

(Minn. 1998) (applying official immunity regularly to the judgment required of police officers in discharging their duties).

### 2. **Rowland and Cannon acted without malice.**

Official immunity is defeated only by proof that the officer committed a willful or malicious wrong. *Elwood*, 423 N.W.2d at 679. Malice is defined as "the intentional doing of a wrongful act without legal justification or excuse, or, otherwise stated, the willful violation of a known right." *Rico v. State*, 472 N.W.2d 100, 107 (Minn. 1991). The question of malice is an "objective inquiry into the legal reasonableness of an official's actions." *State by Beaulieu*, 518 N.W.2d at 571. A plaintiff must do more than allege malice or willfulness; he must present specific facts showing that the official knew what he or she was doing lacked legal justification. *Reuter v. City of New Hope*, 449 N.W.2d 745, 751 (Minn. App. 1990); *Kelly v. City of Minneapolis*, 598 N.W.2d 657, 663 (Minn. 1999) (defining "malice" as "intentionally committing an act that the official has reason to believe is legally prohibited").

There is no evidence in the record that either Rowland or Cannon acted without legal justification in any of their actions involving K.W. Their removal of K.W. from Creekview Park was reasonable in light of the 911 call that there was an "unwant" at the park. As Officer Cannon testified: "[W]hen staff call police to a park, it's because staff members have exhausted every attempt to try to work out internally and to try to get the kid to leave. At that point, what happens—usually what happens is that, once the person –we get the person out of the building." Walther Aff., Exhibit 2 at 20.

11

In addition, the manner in which they removed K.W. from the park was reasonable. K.W. as well as the officers described the "escort" hold that Rowland and Cannon had on K.W. Walther Aff., Exhibit 1 at 40-41; Walther Aff. Exhibit 2 at 22-24; Walther Aff., Exhibit 3 at 19-24; *see also Hyatt v. Anoka Police Dept.*, 691 N.W.2d 824-828 (Minn. 2005)(applying criminal statute, Minn. Stat. §609.06, providing for reasonable use of force to effect an arrest to a civil action). The officers promptly removed K.W. from the building in this manner. Walther Aff., Exhibit 1 at 42. K.W., however, resisted. *Id.* at 42-44; Walther Aff., Exhibit 2 at 21-22; Walther Aff., Exhibit 3 at 25; *Cf. Hill v. Scott*, 349 F.3d 1068, 1074 (8th Cir. 2003)(finding "[t]here is no right to resist an unlawful search or arrest"). While K.W. was resisting, the officers heard his arm "pop" or "snap." Walther Aff., Exhibit 2 at 26; Walther Aff., Exhibit 3 at 25-26. They immediately released their hold on K.W., led him to the ground and called for an ambulance. Walther Aff., Exhibit 1 at 49; Walther Aff., Exhibit 2 at 37; Walther Aff., Exhibit 3 at 30.

There was no malice in either of these officer's actions. Plaintiff cannot produce any evidence showing that these officers "intentionally commit[ed] and act that [they had reason to believe [was] legally prohibited." *Kelly*, 598 N.W.2d at 663. Therefore, as a matter of law, Rowland and Cannon are entitled to official immunity on Plaintiff's negligence claim.[12]

---

[12]If Officers Rowland and Cannon are entitled to official immunity, then the Park Board is entitled to vicarious official immunity. *Schroeder v. St. Louis County*, 708 N.W.2d 497, 508 (Minn. 2006); *see also Pahnke v. Anderson Moving and Storage*, 720 N.W.2d 875,

### C. A Claim for Medical Expenses and Loss of Services is not a Cause of Action.

In Count V of the Complaint, Plaintiff attempts to assert a claim for medical expenses and loss of services. Plaintiff claim, however, is not a cause of action on which liability can be based; it is a measure of damages.

Under traditional Minnesota common law, a parent could recover damages based on injury to their child for loss of the child's earnings, contributions, and services that the parents would have received until the child reached majority age. *See Eichten v. Central Minn. Co-op Power Ass'n of Redwood County,* 28 N.W.2d 862, 871 (Minn. 1947); *Dentinger v. Uleberg,* 213 N.W. 377 (Minn. 1927). Even in these cases where damages were allowed there was an underlying cause of action on which the award of damages was based, i.e. negligence. *See Eichten*, 28 N.W.2d 862 (awarding damages in accident involving an automobile) *Dentinger*, 213 N.W. 377(awarding damages in accident involving a bicycle and an automobile).

In 1961, the Minnesota Supreme Court determined that basing a parents' recovery for injury to the child on loss of the child's earnings or contributions was an outmoded concept, suited to the agrarian society in which it was developed but outmoded in modern times. *Fussner v. Andert*, 113 N.W.2d 355, 358-359 (Minn. 1961)(finding pecuniary loss test for parents' recovery under wrongful death statute outdated and unduly restrictive). Moreover, under Minnesota law, a parent's recovery based on injury to his/her child does

---

884 (Minn. App. 2006); *Meier v. City of Columbia Heights*, 686 N.W.2d 858, 863 (Minn. App. 2004).

not include damages for loss of consortium. *Father A v. Moran*, 469 N.W.2d 503, 507 (Minn. App. 1991).

Here, Plaintiff has set forth a damage claim that is not based on any specific underlying tort or on any specific statute. *See Fussner*, 113 N.W.2d 355 (basing decision on Minnesota's wrongful death statute). Thus, as a matter of law, her claim fails. And, even if in response to this motion for partial summary judgment, Plaintiff asserts an underlying claim, she still cannot prove that she is entitled any damages for the loss of K.W. services.[13]

At her deposition, Plaintiff was specifically asked whether she was deprived of any of K.W.'s earnings because of his injuries. Walther Aff., Exhibit 5 at 62. She replied: "No." *Id*. at 63. Plaintiff did say, however, that K.W. helped around the house and would walk and pick her daughter up. *Id*. at 63-64. K.W. lost no earnings because of his injuries. *Id*. at 63. And, any claim for future earnings would be speculative. *See Sturlaugson v. Renville Farmers Lumber Co.*, 204 N.W.2d 430, 432 (Minn. 1973) (holding damage awards that have insufficient evidentiary support and are based purely on speculation cannot be sustained). Thus, Plaintiff's claim is baseless.

## VI. CONCLUSION

Based on the above, there are no genuine issues of material fact which preclude this court from granting Defendants partial summary judgment on Plaintiff's claims

---

[13] Plaintiff testified at her deposition that the medical expenses she incurred for K.W.'s treatment were totally covered by Plaintiff's health insurance. Walther Aff., Exhibit 5 at 57. She did, however, have some expenses for co-pays on medication but estimated the co-pays to be between $10.00 and $25.00. *Id.* at 58.

alleging violation of the MHRA, negligence or loss of potential earnings. The Defendants therefore respectfully request that the court grant their motion for summary judgment on these claims.

Date:  March 7, 2011                                      s/ Ann E. Walther
                                                          Ann E. Walther #21369X
                                                          Karin E. Peterson # 185048
                                                          Rice, Michels & Walther LLP
                                                          10 Second Street NE, Suite 206
                                                          Minneapolis, MN  55413
                                                          (612) 676-2300
                                                          (612) 676-2319 (Facsimile)

                                                          ATTORNEYS FOR DEFENDANTS